[1] Reported in 36 N.W.2d 336.
[2] Certified to United States Supreme Court March 22, 1949.
On January 10, 1948, the district court of the sixteenth judicial district, after a final hearing on the engineer's and viewers' reports, ordered the establishment of judicial ditch No. 12 in Grant, Traverse, and Wilkin counties. The order is brought here for review both by certiorari and appeal. Since it is properly here, by one method or the other, it is unnecessary to determine whether the correct procedure was adopted.
The Great Northern Railway Company and the Minneapolis, St. Paul Sault Ste. Marie Railroad Company, the latter hereinafter referred to as the Soo Line, whose rights of way cross the drainage district, were assessed for benefits. They are the only owners of properties affected seeking a review of the proceedings.
The drainage area of the proposed ditch comprises about 120 square miles or 80,000 acres. The main ditch runs northwest and southeast, and north and east of state highway No. 9. The right of way of the Great Northern Railway Company adjoins and parallels the highway to the south and west of it. The right of way of the Soo Line crosses the highway and the right of way of the Great Northern. The original petition called for a main ditch and three laterals. The engineer in his report prior to the appointment of viewers recommended the addition of two laterals. At the final hearing a sixth lateral was added.
1. The first question to be considered is whether the proposed drainage system is practicable and feasible and such that it will be *Page 485 
of public utility and benefit and promote the public health. The court found that it met the above requirements. Relators-appellants seriously question the findings. A.M. Hopeman, appointed by the court as engineer to lay out the proposed drainage system, had had considerable experience in connection with drainage projects, some of them in this same territory, having acted as engineer on 400 miles of ditches. He testified that the proposed judicial ditch No. 12 is "one of the most feasible projects I have had in more than forty years." The engineers of the water resources division of the state conservation department questioned the size of the ditch and offered suggestions which they said might help out. They admitted that the direction of the main ditch, "generally speaking," was right and that the plan would make an ideal drainage condition for lands west of the Great Northern tracks, "a wonderful plan for this land." The ditch outlets into the Rabbit River. The conservation department engineers thought the outlet too small, while Hopeman considered it sufficient. We have not detailed all the evidence on this feature of the case, but sufficient to indicate that the court's finding that the proposed drainage system will be of public utility and benefit, will promote the public health, and that it is practicable and feasible is abundantly supported by the record.
2. The statute provides that the ditch engineer shall make a detailed survey and furnish all necessary plans and specifications for the proposed improvement. M.S.A. 106.08. Relators-appellants contend that Hopeman, the engineer, failed to comply with this statute. Their claim is based upon the following facts. State highway No. 9 will parallel the proposed main ditch for approximately 16 miles. It was contemplated that the material removed in the construction of the ditch would be used as a base for the reconstructed highway. The construction of the ditch and the rebuilding of the highway were to constitute a combined improvement. The highway department was therefore naturally very much interested in the proposed ditch. Its engineers made detailed plans of the combined highway and ditch improvement, including cross sections. Since the state was to use the excavated material in the reconstruction *Page 486 
of its trunk highway, it had to know how much would be available for its purposes. To get the best results, it was not only desirable but necessary that the ditch engineers and the highway engineers coöperate. The highway department did its work at Morris. Hopeman checked the plans there. He collaborated and coöperated with the engineers of the highway department. He testified that the work was "even more complete" than if he had done it himself. Hopeman and the 15 men employed under him did all the work in connection with getting out the plans and specifications for the six laterals. The only complaint made was that the highway department was an interested party and therefore that the work represented its interest and not the ideas of the ditch engineer. Except as already indicated, no suggestion was made that the plans were faulty or that they would have been better if made by the ditch engineer himself and his assistants. Hopeman stated that the plans and specifications represented his views as fully as if executed by himself. A saving of time and money resulted from the arrangement. There was no duplication of work. Certainly, no one was prejudiced. The arrangement was commendable, not censurable, and in our opinion not in contravention of the statute which specifies the duties of the officially appointed ditch engineer. If the ditch engineer had duplicated the work already done by the highway engineering force in connection with the laying out of the main ditch, he personally would have done little more than to supervise. The actual work would have been done by his assistants. Although Hopeman did not supervise the making of the plans for the main ditch, he checked and approved them.
3. Appellants-relators contend that the viewers adopted an improper and illegal method of assessing benefits and awarding damages and that their action was arbitrary, unreasonable, and capricious. An analysis of the record does not bear out their claims. The viewers spent 45 to 47 days examining the parcels of land lying within the proposed drainage system. The testimony of viewer Beeson indicates that their inspection was thorough. He showed by his testimony an unusual understanding of the problems involved *Page 487 
in the proposed system as a whole and those which arose in connection with each individual tract. The viewers inspected every parcel of land and had plats of every section, in some cases dividing or breaking down the sections into 20-acre tracts. They interviewed residents in the area where the inspection itself did not furnish sufficient information. After their field work had been completed they spent five or six days preparing their report. For assessment-of-benefit purpose, farm lands were divided into four classes. The assessment on such lands ran $14, $10, $5, and $2 per acre, depending upon the benefits to be derived from the construction of the ditch and its laterals. The cost of the improvement was estimated at less than half the amount of the assessments. The railroad rights of way were assessed on a different basis, as was the state highway right of way. In the assessment for benefits of 80,000 acres, errors are bound to creep in, but there is nothing in the record which would justify the court in throwing out the viewers' report.
4. The fact that the viewers failed to assess about 150 acres out of over 80,000 which would be benefited by the improvement does not vitiate the report. The viewers gave as their reason for the omission the fact that the petition would have to be amended to include that area in the drainage system, and they "didn't bother the engineer about taking those extra lands in." It was said in In re Establishment of Judicial Ditch No. 75,172 Minn. 295, 298, 215 N.W. 204, 206, 216 N.W. 229:
"* * * Even if lands that ought to have been assessed were omitted, it does not go to the validity of the order establishing the ditch or making the assessment."
5. There may be errors in individual assessments. Such errors, if any, may be corrected on appeal from the assessments. In re Judicial Ditch No. 12, 147 Minn. 290,180 N.W. 119. They are not before us now. The Great Northern and the Soo Line, who were assessed for benefits in amounts of $150,000 and $50,000 respectively, have appealed from such assessments. If the viewers erred as to *Page 488 
the amounts in these specific cases, of course the opportunity is there for correction.
6. The original petition called for a main ditch and three laterals. The ditch engineer in his preliminary report recommended the addition of two more laterals. The court ordered the addition. No complaint is made here of the court's action as to these additions. At the final hearing, the property owners petitioned for the addition of another lateral, to be designated as lateral No. 6. The petition was signed by 11 landowners claiming to own 2,880 acres of farm lands affected thereby. The viewers in their final report recommended this additional lateral, stating "that unless said lateral were constructed, said area [of about 3,000 acres] will not get full, adequate and complete drainage from said system." The lateral as ordered established did not extend beyond or outside of the original drainage area as designated by the engineer. He testified that there was sufficient outlet for this lateral in the main ditch. The viewers filed a supplemental report covering this additional lateral. No increased assessment of benefits was made against either of appellants-relators. We find no error in the court's action in this respect.
7. M.S.A. 106.03 provides in part as follows:
"Before any public drainage system, drain, or other improvement authorized by this chapter shall be established,a petition signed by not less than a majority of the residentowners of the land described in the petition or by the ownersof not less than 51 per cent of the area of such land, settingforth the necessity thereof, that the same will be of public utility and will promote the public health, the description of the starting point, the general course and terminus of the same, together with a description of the lands over which theproposed ditch or improvement passes, * * * shall be filed, * * *." (Italics supplied.)
After the petition herein had been filed, the court in an ex parte order appointed a ditch engineer, pursuant to the statute. In its order, the court found that the petition "to its satisfaction has been *Page 489 signed by a requisite number of qualified persons as requiredby statute and that said petition is in all respects full and sufficient * * *." (Italics supplied.) In its final order, dated January 10, 1948, the court found:
"That the original ditch petition filed herein is in all respects and particulars ample and sufficient in law and complies with the statutes applicable thereto, and that thesame is signed by a sufficient number of resident owners oflands over which the proposed ditch will pass." (Italics supplied.)
Appellants-relators contend that the ditch petition was not signed by a sufficient number of landowners to give the court jurisdiction. "This, in our opinion, raises the only serious question in the case.
The final hearing on the engineer's and viewers' reports and on the establishment of the ditch system and laterals was set for October 25, 1947. On that day, the Soo Line filed a protest, requesting the court to disallow and disaffirm the viewers' report and the engineer's report on the following grounds:
(1) That the engineer's report is based on conjecture and speculation and has no substantive basis in evidence;
(2) That the viewers' report is similarly based.
'The question of jurisdiction was not raised. On the same date, the Great Northern Railway Company, after stating that the viewers' report recommended an assessment against it of $150,000 as alleged benefits, objected on the grounds:
(1) That there is no need for said judicial ditch No. 12;
(2) That the construction and operation of the ditch would be detrimental to the drainage in the area involved and other territory;
(3) That no benefits will accrue to the Great Northern Railway Company.
No objection was raised by it either as to jurisdiction. The testimony taken at the hearing covers more than 600 pages of the record. At the close of the hearing, counsel for the Soo Line requested the court, in case it denied certain other motions made in its behalf, that — *Page 490 
"the court examine the facts and make a determination as to whether or not there are sufficient petitioners on the original petition on the basis of the four additional laterals as added, and if the court find that there are not sufficient petitioners, the court dismiss the petition."
This again does not challenge the sufficiency of the original petition. The court by the motion was asked to take into consideration all the laterals added during the proceedings and then to say whether, taking into consideration the original petition and all six laterals, the original petition had the required percentage of signers to cover not the ditch involved in the original petition, but the whole system as finally laid out. Of course this suggestion of counsel did not challenge the sufficiency of the original petition. The Great Northern made no suggestion as to jurisdiction.
The Soo Line petitioned for a writ of certiorari. It sets out numerous reasons why it considers the proceedings herein "irregular, illegal, null and void." Among others it states:
"That the original petition filed in said proceeding is neither ample nor sufficient in that with the addition of Lateral No. 4, Lateral No. 5, and Lateral No. 6 the petitioners for said ditch do not constitute 51% of the owners of the land over which the ditch will pass, as required by law."
The Great Northern also petitioned for a writ of certiorari. It also sets out numerous reasons for its claims that the proceedings are illegal and void, among others:
"That the petition for said ditch filed in said proceeding is neither ample nor sufficient in that with the addition of Lateral No. 4, Lateral No. 5 and Lateral No. 6 the petitioners for said ditch do not constitute 51% of the owners of the land over which the ditch will pass, as required by law."
The statute requires a petition signed by not less than a majority of the resident owners of the lands over which the ditch will pass, or by the owners of not less than 51 percent of the area of such *Page 491 
land. § 106.03. Laterals Nos. 4, 5, and 6, of course, were added by the court after the petition was filed. The lands over which these additional laterals pass were not described in the petition. From the language used in the petitions for certiorari, it may be inferred that petitioners for the writs admit that if laterals 4, 5, and 6 had not been added the petition for the ditch would have been sufficient. So, throughout the whole proceeding and in the petitions for certiorari addressed to this court, appellants-relators did not question the sufficiency of the original petitions. The first time we find specific objections to it, based on insufficiency of the number of petitioners, is in the briefs filed in this court. The trial court found twice that the petition was sufficient as having been signed by the required number of persons, first, when it made its order appointing the ditch engineer, at which time it said that it finds to its satisfaction that the petition has been "signed by a requisite number of qualified persons as required by statute," and again in its final order when it stated that the petition is "signed by a sufficient number of resident owners of lands over which the proposed ditch will pass." These findings remained unchallenged until, as we have stated, objections were raised in the briefs filed in connection with the review here.
Section 106.25 reads as follows:
"Upon due publication, posting, and mailing of the notice provided for in section 106.24 [notice of final hearing], the county board, in the case of county drainage proceedings, and the district court, in the case of judicial proceedings, shall have jurisdiction of each tract of land, all public highways, railroads, and all other property in the engineer's and viewers' reports described, * * * and of each tract of land described in the notice, and of each tract of land owned by any of the persons * * * whose name appears in the notice that is affected by the proposed drainage system or laterals and all other persons and corporations, municipal and otherwise, that are named in the notice, * * *."
Appellants-relators do not question the publication, posting, and mailing of the notice of final hearing. They also appeared generally *Page 492 
at the hearing. We then have a situation where the court has twice found that the petition is sufficient; that such findings remained unchallenged; that proper notice of the final hearing was given; that such hearing was had; that appellants-relators appeared generally; and, finally, a statute which states that where proper notice is given as provided for in the statutes the court shall have jurisdiction of each tract of land described in the engineer's and viewers' report and of all persons and corporations named in the notice.
It is true that a ditch proceeding is one in rem and ininvitum. It is purely statutory, and its provisions must be strictly complied with. Jurisdiction of the district court over the parties and the subject matter in a case entertained by it will be presumed unless want of jurisdiction affirmatively appears on the face of the record or is shown by extrinsic evidence in a direct attack on the judgment or order. Barber v. Morris, 37 Minn. 194, 33 N.W. 559; Wilkowske v. Lynch,124 Minn. 492, 145 N.W. 378; Plaster v. County of Aitkin, 135 Minn. 198,160 N.W. 493; Leland v. Heiberg, 156 Minn. 30,194 N.W. 93; Roscoe Black Co. v. Brown, 164 Minn. 440, 205 N.W. 438; Fulton v. Okes, 195 Minn. 247, 262 N.W. 570; Goodman v. Ancient Order of United Workmen, 211 Minn. 181, 300 N.W. 624; Hempsted v. Cargill, 46 Minn. 141, 48 N.W. 686; 2 Dunnell, Dig. Supp. § 2347. A statutory petition is a jurisdictional prerequisite to the authority of the court or county board to proceed in the matter of establishing a ditch. Legislation has given to the order establishing a public ditch all the final and binding force of a judgment in rem. Curran v. County of Sibley,47 Minn. 313, 50 N.W. 237; State ex rel. Utick v. Board of Co. Commrs. 87 Minn. 325, 92 N.W. 216, 60 L.R.A. 161; Lager v. County of Sibley, 100 Minn. 85, 110 N.W. 355; State ex rel. Pederson v. Watts, 116 Minn. 326, 133 N.W. 971; County of Martin v. Kampert, 129 Minn. 151, 151 N.W. 897; State ex rel. Town of Dovray v. Nelson, 145 Minn. 31, 176 N.W. 181; Conoryea v. Board of Co. Commrs. 161 Minn. 193, 201 N.W. 413; Lupkes v. Town of Clifton, 157 Minn. 493, 196 N.W. 666; In re Judicial Ditch *Page 493 
No. 9, 167 Minn. 10, 208 N.W. 417; State v. Oldre, 179 Minn. 566,229 N.W. 878; Nostdal v. County of Watonwan, 221 Minn. 376,22 N.W.2d 461. The statute makes the order establishing the ditch prima facie evidence of regularity of all proceedings prior to the making of such order. The final order in a ditch proceeding carries with it the usual presumption of regularity and propriety of official action, and is presumptive evidence of the validity of each step taken. This presumption continues until the contrary affirmatively is shown or clearly appears from the record as made. Geib v. County of Morrison, 119 Minn. 261, 138 N.W. 24,9 A.L.R. 839; State ex rel. Boetcher v. Nelson, 137 Minn. 265,161 N.W. 714, 163 N.W. 510; State ex rel. Nepp v. District Court,140 Minn. 375, 168 N.W. 184; County of Le Sueur v. Globe Ind. Co.150 Minn. 120, 184 N.W. 677; Lupkes v. Town of Clifton,157 Minn. 493, 196 N.W. 666; State v. Radke, 161 Minn. 416,201 N.W. 613.
The record here is bare of any evidence to rebut the presumption of validity of the proceedings as shown by the preliminary and final orders. It does not appear from the record as made and certified to this court that the petition was signed by less than a majority of the resident owners of the land described in the petition. Thus, lack of jurisdiction does not clearly appear from the record, and there was no extrinsic evidence showing lack of sufficient signers. To check signatures on a petition to determine the true ownership of the parcels of land involved, more is required than a mere inspection of the names found in the viewers' report and therein designated as owners. A calculation made from a mere inspection of such names does not necessarily result in a correct determination of percentages of true ownerships. An analysis made by relators-appellants of the signatures to the petition, using the tabulation of owners and descriptions of property as found in the viewers' final report, without proof that the named owners were in fact the real owners, is of little assistance. Respondents, admittedly going outside the record, contend that many persons listed as owners were not in fact owners. The presumption that goes with the final order *Page 494 
has not been overcome, and this court cannot hold that the district court lacked jurisdiction.
Order affirmed.