IN RE PETITION OF E. WOODROW TITRUD AND
OTHERS FOR ESTABLISHMENT OF A JUDICIAL
DITCH IN WRIGHT, MEEKER, AND McLEOD
COUNTIES v. HERB ACHTERKIRCH
AND OTHERS.
STATE OF MINNESOTA, BY WARREN SPANNAUS,
ITS ATTORNEY GENERAL, AND ANOTHER,
APPELLANTS-RESPONDENTS.

213 N. W. 2d 408.

November 30, 1973—Nos. 43628, 43629, 43632.

*Bloedel, Slade & Volstad* and *Philip John Bloedel,* for appellant objectors.

*Warren Spannaus,* Attorney General, *C. Paul Faraci,* Deputy Attorney General, *Curtis Forslund,* Solicitor General, *William G. Peterson,* Special Assistant Attorney General, and *Douglas A. Schroeppel,* Assistant County Attorney, for appellant state and county.

*Johnson, Schmidt, Thompson, Lindstrom & Thompson* and *John C. Lindstrom,* for respondents.

Heard before Knutson, C. J., and Otis, Rogosheske, and Kelly, JJ.

PER CURIAM.

These are appeals from a district court order establishing a

judicial drainage ditch to be located in Wright County and affecting a watershed area in Wright, McLeod, and Meeker Counties.

Appellants Cokato Township and several individuals who object to the ditch project (hereinafter designated as objectors) contend that the statutory requirements for establishing a drainage ditch were not met. They argue that total estimated costs are greater than benefits to be derived from the ditch, that the proposed ditch would not be of public benefit and utility, and that the outlet for the ditch is inadequate. The state and Wright County also appealed, contending that the proposed ditch would affect public waters and therefore a permit from the commissioner of natural resources is required for construction of the ditch. We affirm the trial court in all respects.

These proceedings began through a petition, pursuant to Minn. St. c. 106, of area landowners for establishment of a judicial ditch to reclaim wet and overflowed lands so that they could be used for farming purposes. On November 29, 1968, following a preliminary survey and hearing on the project, a detailed survey and plan was ordered and viewers were appointed to determine benefits and damages. At both the preliminary and final hearings, many landowners affected by the proposed ditch appeared in opposition. On January 31, 1972, an order was issued establishing Judicial Ditch No. 15, ordering its construction according to the engineer's final report, and adopting the viewers' report. No appeal to the district court from the viewers' findings of the amounts of benefits and damages has been taken according to Minn. St. 106.631. On March 3, 1972, the attorney general intervened, making a motion to have the order set aside on the grounds that a permit from the commissioner of natural resources to alter a natural watercourse had not been obtained. The trial court denied this motion, holding a permit was not necessary.

The proposed ditch is to follow generally along the course of Sucker Creek, an existing watercourse in Wright County main-

taining a continual flow of water outletting into Cokato Lake. Sucker Creek is the major tributary to Cokato Lake. The village of Cokato is riparian to the stream near its outlet into the lake.

The proposed drainage system would be comprised of an open ditch approximately 9 miles long with a mile-long branch near the middle of the main ditch's length. The proposed terminus of the ditch is into the existing Sucker Creek channel at a point about 1½ miles from Cokato Lake. At this point, there is an existing 13-foot-high stone arch railroad culvert over the creek. The land between this culvert and the lake is relatively flat lowlands sometimes subject to flooding.

Sucker Creek in its present condition averages approximately 2 to 2½ feet in depth. The new open ditch channel would have bottom widths from 4 to 30 feet and depths up to 13 feet. The fall along its entire length is 36 feet or about 4 feet per mile. There was some testimony that since 1905 several public and private ditch systems have channelized the stream bed or used the creek as an outlet. The ditch will serve a watershed area of about 29 square miles or about 18,560 acres. The purpose of the project is to provide the area with needed drainage, for which Sucker Creek in its present condition is inadequate.

■ Objectors' first contention on appeal is that the construction of the proposed ditch should not be permitted because the cost of the project would exceed the direct and immediate benefits to be derived. Minn. St. 106.201 provides that before a ditch may be established it is necessary that total estimated benefits from a drainage system are greater than total costs, including damages.

Objectors' argument that costs on the present drainage project exceed benefits is prematurely raised on this appeal. In re Petition of Winter, 296 Minn. 278, 208 N. W. 2d 725 (1973). The statute governing appeals from orders establishing a ditch provides for an appeal to district court with regard to the amounts of benefits, the amount of damages, and the fees or expenses al-

lowed.[1] On appeal to district court, an aggrieved party may also "include and have considered and determined benefits or damages affecting property other than his own." Minn. St. 106.631, subd. 2(a). As we recently stated in In re Petition of Black, 283 Minn. 86, 88, 167 N. W. 2d 147, 149 (1969):

"* * * [R]econsideration of specific assessments for benefits and awards for damages by a jury must first be undertaken pursuant to Minn. St. 106.631, and * * * without such proceedings there can be no appeal to this court merely on the basis of asserted error in assessments and awards.

"By making timely demand for a jury, appellants may have the viewers' determinations reconsidered as to their land and as to all other lands involved in the improvement. Minn. St. 106.631, subd. 2(a). The jury's verdict would stand in place of the determinations adopted by the district court, *and, if damages and costs are then found to exceed benefits, the petition for the improvement would be dismissed.*

\* \* \* \* \*

"Assuming that errors in the viewers' determinations were indeed systematic and calculated to effect establishment of the improvement, they are nonetheless primarily errors of fact and not of law. Correction of error can better be accomplished by a jury's close and complete scrutiny of all of the determinations alleged to be erroneous than by our own appraisal of the selected situations presented to this court. A jury trial has been required, before an appeal may be taken to this court, even when the viewers' reports failed to award damages for whole classes of injury to land, In re Improvement of County Ditch No. 21, 262 Minn. 210, 212, 215, 114 N. W. (2d) 572, 574, 576, and when whole tracts of land allegedly benefited were not found by the viewers to be part of the watershed. In re Establishment of Judicial Ditch No. 75, 172 Minn. 295, 215 N. W. 204, 216 N. W. 229." (Italics supplied.)

---

[1] Minn. St. 106.631, subd. 1.

Objectors' contention that certain lands could not be assessed because no benefit could possibly result should therefore first be determined by the district court. Likewise, any issues to be raised as to the alleged underestimation of certain damages and of attorneys' and engineers' fees and expenses should first be appealed to district court before we consider them. Minn. St. 106.631, subd. 1.

Objectors also argue that certain costs for the ditch project were underestimated in the drainage authority's order establishing the ditch. Unlike its provision for reconsideration by a jury of the estimated benefits and damages, Minn. St. 106.631 does not require an appeal to district court for reconsideration by a jury of estimated costs. The reason for this is obvious—the accuracy of cost estimates is substantiated by the bids that are received pursuant to § 106.231 for the construction of the proposed drainage system. The procedure when no appropriate bids are received is set forth in Minn. St. 106.241. If all bids submitted are for a price more than 30 percent in excess of the engineer's cost estimate or if they are for a price in excess of the estimated benefits less damages and other expenses, the order establishing the ditch may be set aside. If those interested in the ditch believe the engineer erred in his estimate, they may have an additional hearing. Upon the hearing, the drainage authority may authorize the engineer to amend his report if it appears that the engineer's estimate was erroneous and that a contract could be let within the 30-percent limitation and within the available benefits.

■ The next issue raised by objectors is that the proposed ditch was not of public benefit and utility as required by Minn. St. 106.201, subd. 2. We reject objectors' argument that, in the assumed economic setting of surplus food production, the conversion of wetland acreage to tillable farmland no longer creates a public benefit. The state's Drainage Code indicates a legislative determination that reclamation of wasteland through con-

struction of public drainage ditches is of public benefit.[2] See, In re Petition of Stevens, 291 Minn. 263, 190 N. W. 2d 482 (1971). If objectors' argument that increase in tillable farmland would create only a private benefit at the time this case was tried is correct, it is for the legislature and not the courts to change the present statutory definition and concept of public benefit. Furthermore, the legislature should not be required to look only to the conditions prevailing at the very moment of trial. In fact, the legislature has recently made numerous changes in Minn. St. cc. 105 and 106 which were not considered in writing this opinion, as they were adopted after the trial of this case.[3]

The legislature has also adopted a policy of preserving the environment. Minn. St. 106.671 expressly directs that in considering whether a ditch project will be in furtherance of present or future public utility, benefit, or welfare, the drainage authority "shall give due consideration" to the conservation of natural resources. In re Petition of Stevens, *supra*. The public benefit and utility derived from reclaiming wetlands for agricultural pursuits must be balanced against the harm which such a drainage project would cause to the state's natural resources. But a finding by the drainage authority that a ditch will be of public benefit or utility is a fact question which we will not disturb unless it is unsupported by the record. In re Judicial Ditch No. 12, 227 Minn. 482, 36 N. W. 2d 336, certiorari denied sub nom. G. N. Ry. Co. v. Lehman, 337 U. S. 938, 69 S. Ct. 1514, 93 L. ed. 1743 (1949); In re Petition of Black, 283 Minn. 86, 167 N. W. 2d 147 (1969).

Although there is some evidence that construction of the present ditch would have an adverse effect on some natural resources, such evidence was minimal in comparison to the evidence of the

[2] Minn. St. 106.011, subd. 14, defines public benefit to include "any works contemplated by this chapter [Drainage] which shall * * * reclaim and render suitable for cultivation lands normally wet and needing drainage or subject to overflow."

[3] L. 1973, cc. 479 and 315.

large amount of presently unusable or marginal farmland which could be made productive by the proposed ditch. We hold that the record supports the drainage authority's finding that the ditch would be of public benefit and utility.

■ Objectors' final contention is that the order establishing the ditch should be reversed because the outlet is inadequate. They argue that the order neither made findings nor drew any conclusions concerning the outlet's adequacy. In In re Improvement of Judicial Ditch No. 53, 282 Minn. 313, 164 N. W. 2d 382 (1969), we observed that among the purposes of the hearing held before the establishment of a drainage ditch is the determination that a proposed outlet is adequate for the project. The drainage authority in the present case found in its order following the preliminary hearing that the outlet was adequate. A specific finding to this effect in the final order establishing the ditch is not necessary. The proposed ditch was found to be "practicable" in the final order, as required by Minn. St. 106.201. We have held that such a determination includes a finding of adequacy of the outlet. State ex rel. Mosloski v. County of Martin, 248 Minn. 503, 510, 80 N. W. 2d 637, 641 (1957); In re Petition for County Ditch No. 53, 238 Minn. 392, 401, 57 N. W. 2d 158, 164 (1953). We will not reverse this finding unless it is unsupported by the evidence. See, In re Judicial Ditch No. 12, 227 Minn. 482, 484, 36 N. W. 2d 336, 338 (1949).

We find that the determination of an adequate outlet through the finding of practicability of the ditch is supported by the evidence. The project engineer also explained that the rate of flow of the water in the ditch will not be appreciably increased. The objective is merely to move the same quantity of water at a lower level. This lowering of the water table also permits more absorption by the surrounding lands and thereby decreases some runoff and erosion. The project engineer further explained that the reason the culverts for the project are larger than those presently in Sucker Creek is that the culverts are designed to handle a greater flood than the ditch itself. Because more costly flood

damage would occur to culverts and crossings than to farmland which has been overflowed, culverts are designed to handle a flood of much greater magnitude.

Objectors also contend that flooding will occur downstream from the terminus of the ditch to Cokato Lake. The evidence, however, fairly shows that these low-lying areas will not be subject to greater flooding than they presently are. The evidence also shows that the railroad stone arch culvert of 13 feet near the end of the ditch will be adequate for the project, the project engineer estimating that the culvert will be utilized to only 9 feet of its capacity. Although it is recognized that some overbanking is inevitable at peak times of runoff, the evidence supports a finding that the outlet is adequate to handle the designed needs of this proposed drainage system.

■ The State of Minnesota raised the following issues on its separate appeal: (1) Does Sucker Creek constitute "public waters" requiring a permit from the commissioner of natural resources to alter or change its course? (2) Is a public stream which had under previous proceedings been channelized exempt from the requirement of securing a permit? (3) Do the permit provisions of Minn. St. c. 105 apply to drainage proceedings under Minn. St. c. 106? All of these issues hinge on whether Sucker Creek is "public waters" within the contemplation of the Drainage Code. Approval is required for all drainage projects affecting public waters. Minn. St. 106.021, subd. 3; Minn. St. 105.42.

According to Minn. St. 1971, § 105.38(1), public waters which are subject to state control include all waters in streams and lakes which are "capable of substantial beneficial public use." [4] The waters of the state are capable of innumerable uses which are beneficial to the public. The public derives benefit from lakes

---

[4] This language was stricken in the 1973 amendment of Minn. St. 1971, § 105.38. See L. 1973, c. 315, § 4, which provides in part: "(1) Subject to existing rights, all waters which serve a beneficial public purpose are public waters subject to the control of the state."

or streams used for recreational, environmental, industrial, agricultural, municipal, domestic, and other purposes. But it is also apparent that under the applicable statutory definition of public waters the legislature did not intend to subject to state control every pool or shallow stream within the state even though it is capable of some beneficial use. Only those waters which are capable of *substantial* public uses are considered public waters under Minn. St. 1971, § 105.38(1).

The trial court determined that Sucker Creek was not public waters within the meaning of the statute because it was incapable of substantial beneficial public use. After reviewing the record, we hold that this determination was correct.[5] The state in its brief refers to only four beneficial public uses supported in the record. First, Sucker Creek is used as a spawning area for fish from which is derived both recreational and environmental use of the creek. However, testimony also shows that it is primarily a spawning area for rough fish, such as suckers, carp, and bullheads, which are not particularly desirable, and also that the fish may be unable to return to the lake from flooded areas used for spawning. It is, secondly, argued that the area is used for hunting and trapping purposes. There was testimony, however, that the area has little open water and is not an important wildlife refuge.

The state also argues that the creek and surrounding area in its present condition provides a storage area of water to prevent flooding during peak runoff periods. While this may be of public benefit, extending the contention to its logical conclusion would require that all watersheds in the state must be considered "public waters." Certainly the legislature did not contemplate this in its definition. Finally, the state mentions the present use of the creek as the discharge duct for the sewer systems of the vil-

---

[5] The state also argues that the drainage authority erred in failing to articulate its reasons for finding Sucker Creek was not "public waters." Specific reasons, however, need not be stated as long as the finding is supported by the evidence.

lage of Cokato and the future use of the creek for municipal and recreational purposes by the village.

Even accepting these public uses as established by the record, we do not believe that taken together they add up to a substantial beneficial public use. There is insufficient evidence before us to conclude that the trial court erred in finding that this creek of 2 to 2½ feet in average depth was not "public waters" because it was incapable of substantial beneficial public use.

Because we conclude, based on the record before us, that the trial court's determination that Sucker Creek is not public waters within the statutory meaning is not clearly erroneous, it is unnecessary for us to consider the other issues raised by the state.

Affirmed.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.