**Sheldon PRATT, Respondent,**

v.

**STATE of Minnesota, DEPARTMENT OF NATURAL RESOURCES, by Robert L. Herbst, Its Commissioner, Appellant.**

**No. 51180.**

Supreme Court of Minnesota.

Aug. 28, 1981.

Warren Spannaus, Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., and Tibor M. Gallo, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Ryan, Ryan & Ruttger and Thomas J. Ryan, Brainerd, for respondent.

SIMONETT, Justice.

This is an appeal by the state from a decision of the district court finding a compensable taking of plaintiff's property by reason of a legislative change in the character of the water in three sloughs from private to public. The appeal is from an order denying the state's motion for a new trial. We remand for further proceedings.

In 1975 the state advised Sheldon Pratt he could no longer harvest the wild rice on his property by mechanical picker but had to do it by hand flailing. Since Mr. Pratt felt this would substantially reduce the profitability of his wild rice operation, he submitted a claim for damages to the Legislative Claims Commission.[1] The commission directed Mr. Pratt to seek a declaratory judgment action on whether the wild rice was being grown in public waters and deferred further action on the claim.

Mr. Pratt brought his action in the Crow Wing County District Court, asking that the bodies of water on which he harvested the rice be declared private and "not subject to any control by Minnesota Statutes 105.37 and 105.38." The state interposed an answer asking for judgment that the waters be declared public and subject to state regulation. The trial court, after

---

1. The Legislative Claims Commission, more properly called the Joint Senate-House Claims Subcommittee, is an organ of the finance committees of both houses. Under its rules, it considers claims of individuals against the state for which there is no recourse to either administrative or judicial remedies, and recommends payment in appropriate cases to the full Senate Finance and House Appropriations committees.

hearing the evidence, found the waters to be public. But the court did more. It also found the waters had been private prior to 1973; that the 1973 amendments to Minn. Stat. §§ 105.37 and 105.38 "caused previously private waters to be reclassified as public waters, thus subjecting the rice growing thereon to regulation by the state and vesting ownership of the rice in the state"; and that, consequently, there was a compensable taking under eminent domain law "since he [the plaintiff] may no longer use a mechanical picker on the above-mentioned waters."

The main facts adduced at trial were these: For some 20 years plaintiff has owned three sloughs, called Island Lake, Rice Lake and Tamarack Lake. Island Lake averages 15 inches in depth, 5 feet at the deepest, and it covers about 60 acres. Mr. Pratt owns all the land around the lake. Rice Lake is shallower than Island and covers about 65 acres. Mr. Pratt owns all the surrounding land except for one small parcel. Tamarack Lake is the shallowest of the three lakes, about 3 feet at its deepest and covers 40 acres. Mr. Pratt owns virtually all the surrounding land.

All three lakes are unmeandered, natural waterbasins. They "freeze out" each winter. None has an outlet, except Island. The lakes are not suitable for boating, swimming or fishing, but there are ducks for hunting, muskrat and beaver, and the sloughs are good for raising wild rice. Mr. Pratt purchased the three properties for his private harvesting of wild rice. He has been able to exclude others from harvesting on the lakes. Mr. Pratt harvested all three lakes since the 1950's; he originally seeded Island Lake himself.

Since 1960, Mr. Pratt has used a mechanical picker to harvest his rice. It is more efficient, and hence more profitable, than harvesting manually. The beds are reseeded as necessary.

■ 1. The first issue is whether the evidence supports the trial court's findings that the three lakes were private waters before 1973 and public waters since. We believe the evidence does support these findings.

Prior to 1973, Minn.Stat. § 105.38(1) provided:

> Subject to existing rights all waters in streams and lakes within the state which are capable of substantial beneficial public use are public waters subject to the control of the state. * * *

By 1973 Minn.Laws, ch. 315, the language was changed to read:

> Subject to existing rights all waters of the state which serve a beneficial public purpose are public waters subject to the control of the state. * * *

In other words, since 1973 the test has been a beneficial public *purpose* (not use),[2] and the test applies to all waters of the state, not just streams and lakes.[3]

■ Here the state's hydrologist, applying the criteria of Minn.Stat. § 105.37, subd. 6 (1978), testified that, in his opinion, Island, Rice and Tamarack Lakes were public waters.[4] The hydrologist testified (and

**2.** 1976 Minn.Laws, ch. 83, § 7, added the word "material" to the statutory formula "beneficial public purpose" and amended Minn.Stat. § 105.37, subd. 6, to include specific criteria for determining when such a purpose existed. *See* note 4, *infra*. These amendments did not alter the public water status of Pratt's lakes.

**3.** In making the changes, presumably the legislature had in mind *Stevens v. State, by Head*, 291 Minn. 263, 190 N.W.2d 482 (1971), and *Titrud v. Achterkirch*, 298 Minn. 68, 213 N.W.2d 408 (1973), where this court held a slough similar to the ones involved here and a small creek were not public waters under the "substantial beneficial public use" test. *See*

W. G. Peterson, *Public Water Rights in Minnesota*, 31 Bench & Bar, No. 3, p. 19 (1974).

**4.** The test of "public waters" includes the phrase "beneficial public purpose," defined in Minn.Stat. § 105.37, subd. 6 (1978), as:

(a) Water supply for municipal, industrial, or agricultural purposes;

(b) Recharge of underground water strata;

(c) Retention of water to prevent or reduce downstream flooding, thereby minimizing erosion and resultant property damage;

(d) Entrapment and retention of nutrients and other materials which impair the quality of natural resources;

(e) Recreational activities such as swimming, boating, fishing, and hunting;

there was other testimony as well) that all three lakes exceed the minimum criteria: they serve as watersheds, have sediment and nutrient entrapment, have waterfowl habitat, exceed the minimum size of 10 acres, and have conditions of inflow which can recharge subsurface formations of water. Three of these categories—recharge, nutrient entrapment, and wildlife habitat—are very similar to three of the four uses rejected as *insubstantial* in aggregate under the old test in *Titrud v. Achterkirch*, 298 Minn. 68, 213 N.W.2d 408 (1973).

We hold the conclusions of the district court are justified by the evidence and the applicable legal authority. The 1973 statutory amendments reclassified plaintiff's lakes from private to public.

■ The state next contends it should have a new trial for surprise and lack of notice because the trial court decided an issue that was not pleaded nor raised by either counsel, namely, the finding that the lakes were private before 1973 and the conclusion that a compensable taking therefore occurred by reason of the legislative reclassification. We disagree.

The state argues that if it received a new trial it would show the three lakes were public before 1973. At the hearing on the new trial motion, the state made no showing of what new evidence it might produce other than an affidavit indicating that in 1971 the DNR, in a classification of public waters for Crow Wing County, had listed Rice Lake and Tamarack Lake as public waters. But other than this there was no showing how the factual characteristics of the three lakes were any different before 1973 than after, and, indeed, at the trial evidence was received of the lake characteristics going back to at least the 1950's. Further, it is undisputed the DNR was aware Mr. Pratt was using a mechanical picker for about 20 years prior to 1975 and never objected. And, finally, the state does not dispute that the legal test for public waters was broadened after 1973.

Moreover, the state should not have been surprised, since the trial court, on its own initiative, raised the taking issue during the hydrologist's testimony, and counsel for the state responded that the court's questions would be answered in the trial briefs.[5]

This brings us, then, to the truly troublesome issue in this case. Was there a taking?

■ 2. First of all, reclassifying and declaring waters to be "public" does not, by itself, constitute any taking in the constitutional sense. Ownership, in a proprietary sense, does not thereby pass to the state; rather, waters, once declared public, simply become subject to the protection and control of the state under its regulatory scheme. The state exercises this control by virtue of its police power. The state is said to hold title only in a sovereign capacity, as trustee for the public good, and not in a proprietary sense. *Lamprey v. State*, 52 Minn. 181, 198, 53 N.W. 1139, 1143 (1893); and *see Herschman v. State*, 303 Minn. 50, 225 N.W.2d 841 (1975); *State v. Longyear Holding Co.*, 224 Minn. 451, 478, 29 N.W.2d 657, 672 (1947).

---

(f) Public navigation other than for recreational purposes;

(g) Wildlife habitat areas for the spawning, rearing, feeding, and nesting of wildlife; or

(h) Areas designated as scientific and natural areas pursuant to section 84.033.

This statute was amended again in 1979, deleting the phrase "beneficial public purpose." The three lakes in question still remain public waters under the new changes, however. Section 105.37, subd. 6, was repealed and replaced by subdivisions 14 and 15. Under these new provisions, the three lakes are now classified as type 4 and type 5 wetlands by the DNR—a classification pursuant to U. S. Fish and Wildlife Circular No. 39 and authorized by the stat-

ute. Minn.Stat. § 105.37, subd. 15 (1980). The statute, for most purposes, then declares that all wetlands are public waters. *Id.*, subdivision 14.

5. The trial court asked: "I guess what I am really getting at is that these regulations are based upon law in '74 promulgated in '76 and interfere with an established private use. Was there any method of paying just compensation for that interference within an established private use as required by the Constitution?" Counsel for the state responded, "I think some of the Court's questions will be answered in the briefs. I assume a lot of the questions will be answered in briefs."

■ Nor, properly speaking, does Mr. Pratt "own" these lakes. One does not, at common law, have title to water in its natural state, at least not until it has been artificially confined. Water in its natural state is not property capable of being owned. *Tyler v. Wilkinson*, 24 Fed.Cas. No. 14.312, 4 Mason 397 (1827); 2 P. Nichols, *Nichols on Eminent Domain* § 5.79 (1980). Rather, one may have rights to the use and enjoyment of the water, rights exclusive of the general public, through ownership of lakeshore or lakebed.[6] These rights the law calls riparian. One does not own the water; one owns riparian rights to the use and enjoyment of the water.

In enacting Minn.Stat. § 105.38(2) (1947), wherein the state declares what are public waters, it is significant that this declaration is "subject to existing rights"—*i. e.*, subject to existing riparian rights. The 1980 version of section 105.38 continues this policy, stating: "*Subject to existing rights* all public waters and wetlands are subject to the control of the state." (Emphasis added.) Thus it is clear the legislature did not intend a reclassification of waters from private to public to constitute a taking.

3. Here Mr. Pratt, by reason of his ownership of all or virtually all shoreline of the three lakes had riparian rights to grow and harvest wild rice in the waters of those lakes. The issue thus becomes whether these rights of Mr. Pratt have been taken. Since the wild rice, as of 1973, is now growing in public waters, Minn.Stat. § 97.42 (1980) comes into play:

> The ownership of wild animals, and of *all wild rice* and other aquatic vegetation *growing in the public waters* of the state, insofar as they are capable of ownership, *is in the state in its sovereign capacity for the benefit of all its people,* and no person

shall acquire any property therein, or destroy the same, except as authorized by chapters 97 to 102 or sections 84.09 to 84.15 and Laws 1939, Chapter 231.

(Emphasis added.) Hence Mr. Pratt cannot harvest rice except as authorized by law and the Department of Natural Resources. We next turn to Minn.Stat. § 84.111 (1980), which provides, among other things, that:

> Subdivision 1. It shall be unlawful to use, in harvesting wild rice in any public waters in this state, any water craft other than a boat, skiff, or canoe propelled by hand * * *.
>
> \*   \*   \*   \*   \*   \*
>
> Subd. 3. It is unlawful to use in such harvesting any machine or device for gathering the grain other than a flail not over 30 inches in length nor over one pound in weight, held and operated by hand.

Mr. Pratt claims he will sustain a financial loss if these provisions forbidding mechanical harvesting are applied to him. As yet there has been no showing of any damages, but the state admits in its answer "that the use of hand flails rather than a mechanical picker is less profitable for the harvester." Citing *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and *McShane v. City of Fairbault*, 292 N.W.2d 253 (Minn.1980), the state argues the prohibition against harvesting rice mechanically is not a taking, but merely reasonable regulation, an exercise of its police powers, like zoning. And like a land-use regulation, the bar on mechanical harvesting is valid unless it deprives Mr. Pratt of all reasonable use of his land. While the state concedes the lakes here are of little economic use beyond ricing, it contends the regulation must be presumed reasonable in the absence of evi-

---

**6.** Generally, riparian owners of land on non-navigable lakes own the lakebed in severalty, the boundary lines being fixed by extending lines from each tract to the lake center. *State v. Adams*, 251 Minn. 521, 561 n. 18, 89 N.W.2d 661, 687 n. 18 (1957), and cases cited thereunder. Owning virtually the entire lakeshore of the lakes in question, Mr. Pratt also owns the lakebeds. As Minn.Stat. § 105.37, subd. 14

(1980), makes clear, private ownership of a lakebed does not, by itself, necessarily determine the character of the water as public or private.

In addition, Mr. Pratt would have a right to exclude others from the public waters. This is not a riparian right. It is simply the right any landowner has to prevent trespass over his property.

dence as to the actual losses suffered by Mr. Pratt.

To evaluate the state's argument we must first determine whether the *McShane* decision applies. In *McShane* we discussed the distinction between governmental regulation which constitutes a taking and that which does not. We adopted the test that where the law or ordinance arbitrates between competing land uses, only noncompensable regulation is involved, but—

> We hold that where land use regulations, such as the airport zoning ordinance here, are designed to benefit a specific public or governmental enterprise, there must be compensation to landowners whose property has suffered a substantial and measurable decline in market value as a result of the regulations.

292 N.W.2d at 258–59.

In other words, where the regulation only serves an arbitration function, regulating between competing private uses for the general welfare, ordinarily no taking is involved; but where the regulation is for the benefit of a governmental enterprise, where a few individuals must bear the burden for a public use, then a taking occurs. Thus in *McShane*, where the city zoning ordinance prohibited commercial development of property near the municipal airport, we found these regulations were for the benefit of a governmental enterprise (the airport) and resulted in a substantial diminution of the value of the landowner's property; we therefore held there was a taking.

Can the bar on mechanical wild rice pickers be characterized as serving either an arbitration or governmental enterprise function? We stated in *McShane* that the line between "enterprise" and "arbitration" is not always easy to discern. That is true here.

The statutory scheme of regulation of wild rice plainly serves a public purpose. But does it also benefit a particular government enterprise? Or is it simply a plan to regulate wild rice harvesting, assuring that no one gains a competitive advantage by using a more efficient means of harvesting? The legislature has stated what it has in mind. The regulations are designed to preserve the traditional wild rice harvest for the Indians, as an alternative to subsidies.[7] As section 84.09 says, the admittedly stringent regulations were enacted "to discharge in part a moral obligation to these Indians of Minnesota." This seems to us an enterprise function.

On the other hand, the regulations also serve a conservation function by arbitrating among the competing wild rice harvesters. The regulations are "to protect against undue depletion of the crop so as to retard reseeding or restocking of such area or so as to endanger its effective use as a natural food for waterfowl." Minn.Stat. § 84.15, subd. 1 (1980). The state sets a harvesting

---

7. Minn.Stat. § 84.09 (1980) provides:

From time immemorial the wild rice crop of the waters of the state of Minnesota has been a vital factor to the sustenance and the continued existence of the Indian race in Minnesota. The great present market demand for this wild rice, the recent development of careless, wasteful, and despoiling methods of harvesting, together with water conditions of the past few years, have resulted in an emergency, requiring immediate stringent methods of control and regulation of the wild rice crop. The traditional methods of the Indian in such harvesting are not destructive. On the other hand, the despoliation of the rice fields as now progressing under commercial harvesting methods will result in imminent danger of starvation and misery to large bands of these Indians. They are in danger of becoming relief charges upon the state and the counties, many of which are overburdened with relief loads now. It is further true that many of the reservation lands which were ceded in trust to these Indians have never been sold and others are reverting because of non-payment by the purchasers. It is therefore declared the purpose of sections 84.09 to 84.15, and Laws 1939, Chapter 231, to meet this emergency and to discharge in part a moral obligation to these Indians of Minnesota by strictly regulating the wild rice harvesting upon all public waters of the state and by granting to these Indians the exclusive right to harvest the wild rice crop upon all public waters within the original boundaries of the White Earth, Leech Lake, Nett Lake, Vermillion, Grand Portage, Fond du Lac, and Mille Lacs reservations.

season, much like for hunting or fishing. Minn.Stat. § 84.14, subd. 3 (1980). In other words, the state is also protecting a natural resource, wild rice, for the benefit of the public generally. This seems to us more like an arbitration function.

■ In other words, both the enterprise and the arbitration functions emerge from the wild rice regulatory scheme. We think it would read too much into the legislative intent to characterize the regulations as either predominantly enterprise or predominantly arbitration. Both purposes are prominent.

In *McShane* we said a taking may be found where a statute or regulation serves a governmental enterprise and a substantial diminution in market value results. That case, however, presented the situation in which the governmental enterprise function of a regulation was not just predominant but exclusive. Whether a regulation effects a taking is rarely so simple an issue. The presence of multiple purposes for a regulation, as in the instant case, is, we believe, more the rule than the exception, and to be at all useful, the principles enunciated in *McShane* for determining whether a taking has occurred must be applied with some flexibility. In *Penn Central*, the United States Supreme Court characterizes the inquiry as an essentially *ad hoc* examination of many significant factors, including the extent of economic damages inflicted, the nature of the economic interests affected, the object of the regulation, and the public policy it serves. Recently, in *San Diego Gas & Electric Co. v. San Diego*, —— U.S. ——, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981), the court indicated, "The determination of a 'taking' is 'a question of degree—and therefore cannot be disposed of by general propositions.'" (Brennan, J., dissenting, at 1302) (Rehnquist, J., concurring, agreed with Justice Brennan but determined the case to be jurisdictionally deficient, *i. e.*, not a final judgment or decree, at 1294). We think that here, where the governmental enterprise function is *prominent*, a taking may occur if the landowner's property is substantially diminished in value.

Pratt's case is unique. Usually the public has access to public waters where wild rice is growing. Here, only Pratt, owner of the riparian rights, has ready access to his lakes. He is the only harvester. Pratt acquired his property for the express purpose of having exclusive harvesting rights at a time when the property contained private waters. Pratt was then free to harvest mechanically. His situation was no different from that of a grower of "domesticated" wild rice, *i. e.*, wild rice grown in private, artificially created paddies, where the grower is free to harvest mechanically. Only now, when the designation of the lakes as public waters has triggered application of the wild rice regulation, does Pratt find his intended use of his property circumscribed and its economic value impaired. This impairment, if substantial, would disproportionately burden an individual property owner for the benefit of the public in the furtherance, at least in part, of a governmental enterprise.

■ We therefore hold that the wild rice regulation here at issue, as it has both prominent arbitration and governmental enterprise functions and may unequally and disproportionately affect Pratt's property, may constitute a taking. A taking occurs if there is a substantial diminution in the market value of the property as a result of the regulation. As stated in *McShane*, more than inconvenience or some limitation in use is required. *Id.* at 259.

Unfortunately, the parties did not present evidence on diminution in market value. While the state admitted in its answer that there is some loss if hand flailing is required, we do not know if it is substantial. It is to be kept in mind that, while the property rights impaired by the regulation are the riparian rights to harvest the wild rice, the diminution in market value by reason of this impairment is measured by diminution, if any, in the market value of the tracts of land.

We remand to the district court for the taking of further evidence and a determination if there has been a substantial diminu-

tion in market value of the Pratt property by reason of the prohibition of the use of mechanical harvesters. If this standard is not met, the matter ends (except as Pratt may return to the Claims Commission). If there has been a substantial property loss, then we believe the appropriate remedy, as it was in *McShane,* is to enjoin enforcement of the regulatory scheme against plaintiff's property. *Cf. Holaway v. City of Pipestone,* 269 N.W.2d 28 (Minn.1978); *Connor v. Township of Chanhassen,* 249 Minn. 205, 81 N.W.2d 789 (1957). In other words, the state would either have to condemn plaintiff's property (and there is some doubt if it has the statutory authority to do so) or be enjoined from prohibiting the use of mechanical harvesters on plaintiff's property.

Remanded for proceedings in accordance with this opinion.

SHERAN, C. J., took no part in the consideration or decision of this case.