**AGRA RESOURCES COOP**
**d/b/a Exol, Relator,**

v.

**FREEBORN COUNTY BOARD**
**Of COMMISSIONERS,**
**Respondent.**

**No. A03–1440.**

Court of Appeals of Minnesota.

July 13, 2004.

Arvid Wendland, Wendland Timmerman, Blue Earth, MN, for relator.

Craig S. Nelson, Freeborn County Attorney, Albert Lea, MN, for respondent.

Considered and decided by HARTEN, Presiding Judge; HALBROOKS, Judge; and MINGE, Judge.

## OPINION

MINGE, Judge.

On appeal from the county's imposition of a volume-based fee as a basis for discharges into a ditch, relator argues that Chapter 103E of the Minnesota Statutes regarding ditches does not authorize a volume-based user fee. Respondent county board argues that it lacked the jurisdiction to grant the outlet for industrial wastewater and that its order should be vacated. Because we conclude that a county board, as a ditch authority, may accept the drainage of clean industrial wastewater, and because the statute allows a county board to assess fees as they relate to benefits and maintenance, we affirm.

## FACTS

Relator Agra Resources Coop (Exol) is the owner of an industrial plant approximately five miles from Albert Lea, in rural Freeborn County, that produces ethanol from corn. This process produces approximately 250,000 gallons of industrial wastewater per day. The industrial wastewater is originally drawn from a well, is used for non-contact cooling, and is clean. The plant is connected with Albert Lea's wastewater-treatment facility. Although this cooling water has been included with other discharges from the plant, the Minnesota Pollution Control Agency (MPCA) has determined that Albert Lea may no longer accept Exol cooling water that does not require treatment as discharge to its wastewater facility.

In November 2002, Exol submitted a petition to respondent Freeborn County Board of Commissioners (Board), as the drainage authority for County Ditch No. 16 (CD 16), seeking approval for a private drain tile outlet connecting to Lateral 1–A for the discharge of its non-contact industrial cooling water. Lateral 1–A is an underground drain tile that was initially constructed to benefit lands owned by Exol beyond the plant site and to benefit the lands of others. Although a subsurface line, Lateral 1–A was designed to accept the drainage of surface waters. The benefited land, which did not include the plant site, had previously been assessed for the cost of CD 16 and Lateral 1–A.

In response to Exol's petition, the Board appointed an engineer and viewers and ordered survey reports. While subsequently expressing concern about overloading the drainage system, the March 2003 engineer's report nonetheless recommended that Exol be allowed to discharge its cooling water at a rate of 250,000 gallons per day. The June 2003 viewers' report recommended an outlet fee and determined the amount of drainage benefit to Exol. Additionally, the viewers recommended that the Board establish a user fee in the amount of three one-hundredths of a dollar (.03 dollars) per 100 gallons discharged, to be metered every six months and billed twice a year. The viewers subsequently amended their report, reducing the user fee to two one-hundredths of a

dollar (.02 dollars) per 100 gallons discharged. The Board considered and adopted the amended viewers' report at a county board meeting. The Board subsequently issued its final order and findings of fact with the provision that the user fees would be reviewed after two years.

Exol appealed and this court issued a writ of certiorari on September 30, 2003. Exol challenges the user fees in the final Board order pursuant to Minn.Stat. § 103E.401, subds. 2, 3 (2002), alleging that the Board's imposition of a user fee is beyond its authority. For the first time on appeal, the Board, as respondent, asserts it had no jurisdiction or authority to accept Exol's private wastewater into the county ditch system and that its action in accepting Exol's petition was improper.

## ISSUES

1. Does a county board, acting as a drainage authority, have authority to allow the use of a ditch for the discharge of industrial wastewater?

2. Is the assessment of a per-gallon user fee beyond the authority of a county board when, acting as a drainage authority, the county board assesses the benefits in providing a drainage outlet to an existing ditch?

## ANALYSIS

### I.

■ The first question we address is whether the Board, acting as a drainage authority, has authority to allow the use of a ditch for the discharge of industrial wastewater. At the outset, we note the unusual posture of this case. The Board took action that it now claims was beyond its jurisdiction. With respect to this issue, the Board has not filed any notice of review of its own decision, and there is no indication that Exol was notified of this claim except by service of the Board's brief.

■ Raising new issues on appeal is often not permitted, and this court may disregard such issues, claims and arguments. *See Thiele v. Stich,* 425 N.W.2d 580, 582–83 (Minn.1988). However, in the interest of bringing closure to this matter, we will exercise our discretion and address the question of the Board's authority. *See Putz v. Putz,* 645 N.W.2d 343, 350 (Minn. 2002) (stating that, pursuant to Minn. R. Civ.App. P. 103.04, an appellate court may review any matter as the interest of justice may require).

■ Authority over a drainage system is granted to the board of county commissioners where the drainage system or project is located. *See* Minn.Stat. § 103E.005, subds. 5, 9 (2002); *In re Matter of Comm'rs Order Denying Permit Application 93–1024,* 527 N.W.2d 173, 175 (Minn.App.1995) ("State law also grants 'drainage authorities' substantial power to regulate 'drainage' on a local level."), *review denied* (Minn. April 27, 1995). "Minnesota's laws pertaining to drainage ditches are a complex matrix adopted with the intent of reclaiming agricultural land by disposing of excess water that renders the land untillable and fairly allocating the costs among benefited landowners." *In re Improvement of Murray County Ditch No. 34,* 615 N.W.2d 40, 45 (Minn.2000) (citation omitted). Minnesota drainage laws must be liberally construed. *Id.* At the same time, drainage authorities and counties are entities that have been created by the state and have only such powers expressly granted to them and necessary to carry out their statutory functions. *Kasch v. Clearwater County,* 289 N.W.2d 148, 151–52 (Minn.1980). The Board raises jurisdictional and statutory interpretation claims, which are questions of law we review de novo. *Harms v. Oak Meadows,*

619 N.W.2d 201, 202 (Minn.2000) (jurisdiction); *In re Improvement of Murray County Ditch No. 34,* 615 N.W.2d at 45 (statutory interpretation).

Generally, a drainage authority is authorized to make orders regarding the construction and maintenance of drainage systems. Minn.Stat. § 103E.011, subd. 1(1) (2002). "A person seeking authority to use an established drainage system as an outlet must petition the drainage authority." Minn.Stat. § 103E.401, subd. 3. Once final hearing notice is given, the drainage authority has jurisdiction over the property and persons detailed and described in the survey and viewers' reports. Minn.Stat. § 103E.331 (2002).

The Board argues that it lacked jurisdiction over the outlet petition because it ultimately lacks the authority to authorize the drainage of industrial wastewater that originally comes from underground sources. The Board contends that the statute only gives it authority over the drainage of surface waters such as storm and agricultural run-off.

The statutes are silent on the Board's authority to accept clean industrial water into a drainage ditch. There is no language in the drainage statutes that limits the Board's authority to only allow surface waters into ditch systems. In fact, subsurface tile systems are commonplace in farmlands. These systems collect both surface and subsurface waters and discharge into ditches.

Municipalities are specifically authorized to use drainage ditches as outlets for municipal drainage systems or the overflow from such systems. Minn.Stat. § 103E.411, subd. 1 (2002). That such drainage includes effluent from municipal wastewater-treatment plants has been recognized. *See* Op. Att'y Gen. 602h, (Feb. 18, 1936) (advising a county board of its authority to authorize the use of a drainage ditch for treated waters from a sewage disposal plant).

▪ Although attorney general opinions interpreting the law are not binding on the courts, they are helpful and entitled to careful consideration. *State v. Ross,* 472 N.W.2d 185, 186 (Minn.App.1991). In this context, we note that there is an attorney general's opinion considering whether an agricultural soybean processing cooperative located within a municipality could discharge clean cooling water into an existing judicial ditch. *See* Op. Att'y Gen. 602 (Mar. 20, 1951). The assistant attorney general recognized the sensitivity of the issue and determined that the ditch authority should not accept the cooperative's petition, but that the cooperative could discharge the water into the municipal wastewater system in the municipality where the plant was located. *Id.* The municipality could then discharge the water into the judicial ditch. *Id.* Other opinions have found that ditches can be used as outlets for private septic systems and for a creamery. *See* Op. Att'y Gen. 602–H (Mar. 26, 1958) (addressing private septic systems); Op. Att'y Gen. 602h (Feb. 18, 1936) (recognizing past decisions involving a creamery). It appears from these attorney general opinions that private wastewater connections to drainage ditches have been permitted in rural areas in this state. However, there is also clear recognition that the user of the ditch or the land benefited by the outlet must pay an assessment for that benefit. *See* Op. Att'y Gen. 602–H (Mar. 26, 1958); Op. Att'y Gen. 602h (Feb. 18, 1936).

Here, Exol petitioned the Board for access to an established drainage ditch system as an outlet pursuant to Minn.Stat. § 103E.401, subds 2, 3. The request was referred to the drainage engineer and viewers, they completed their reports,

and after giving notice of a final hearing, the county held a hearing on the matter. The statutes do give the Board general jurisdiction and authority over subjects covered in such reports. *See* Minn.Stat. § 103E.331. Clearly the subject of this Exol drainage petition was the subject of the report. Admittedly, the use of this statute as a source of authority has a bootstrap dimension to it and has the potential to be abused by a county. However, because there is no reason to categorically prohibit the county board from considering this type of petition, because use of outlets for industrial drainage has historically been approved, and because counties have certain flexibility in determining the design and use of drainage systems, we determine that the Board in this case had jurisdiction to consider and act on Exol's petition.[1]

## II.

Having determined that the Board had jurisdiction to accept Exol's outlet petition for the drainage of industrial wastewater, we next consider the authority of the Board to assess Exol with a user fee of .02 cents per 100 gallons of wastewater discharged. Exol alleges that such a fee is beyond the Board's authority under the drainage statute. Whether the drainage statute authorizes the Board to assess a user fee is a question of statutory interpretation, which we review de novo. *See In re Improvement of Murray County Ditch No. 34*, 615 N.W.2d at 45.

At the outset, we note that the drainage statute provides some structure in determining costs and benefits to land owners as a result of drainage systems. The language of the statute addressing the use of an existing drainage system as an outlet provides that "[a] private drainage system may not be constructed to use the established drainage system as an outlet until the outlet fee, set by order, is paid by the petitioner to the county treasurer where the petitioner's property is located." Minn.Stat. § 103E.401, subd. 5 (2002). The outlet provisions of the drainage statute further provide that a final order must state the amount of benefit to the property as the result of the outlet and state that the "property benefited is liable for assessments levied after [the time of the final order]." Minn.Stat. § 103E.401, subd. 4 (2002). Although not exactly the present situation, we note that Minn.Stat. § 103E.315, subd. 6(a) (2002), provides:

> If the proposed drainage project furnishes an outlet to an existing drainage system and benefits the property drained by the existing system, the viewers shall equitably determine and assess:
>
> (1) the benefits of the proposed drainage project to each tract or lot drained by the existing drainage system;
>
> (2) a single amount as an outlet benefit to the existing drainage system; or
>
> (3) benefits on a watershed acre basis.

---

**1.** The parties do not raise, and we do not sua sponte raise or address environmental issues that may arise from use of a ditch system as an outlet for industrial wastes. Certainly the Board has the discretion and responsibility to consider such matters. Furthermore, the Board's ability to use the drainage system is not without limitation. *See, e.g.*, Minn.Stat. §§ 84.01–.99 (Department of Natural Resources), 103A.001–.43 (Water Policy and In-

formation), 103D.011–.925 (Watershed Districts), 116C.01–.08 (Environmental Quality Board), 116D.01–.11 (Environmental Policy) (2002 & Supp.2003). We also note that this petition was the result of a directive from the MPCA to the city of Albert Lea that it stop accepting this discharge of clean water by Exol into the Albert Lea sanitary sewer system.

Here, Exol had a drainage arrangement in existence which it proposes to replace with the outlet to Lateral 1–A of CD 16.

■ The Board took painstaking measures to assess the cost to the ditch system and the benefits to Exol as a result of the proposed outlet.[2] The Board appointed an engineer and viewers to make assessments. The Board went through lengthy calculations based on the assessment that Exol would discharge 250,000 gallons of industrial wastewater per day. Such a discharge will result in a constant flow of industrial wastewater in the ditch system that will not significantly fluctuate based on rainfall, as does agricultural runoff. The amount of water entering the system is undisputed and predictable. Accordingly, the Board's detailed calculations produced a reasonable conclusion. There is obviously a benefit to Exol to be able to move this water. By looking at the volume of the water and the surface area drainage equivalent, the Board used a traditional drainage perspective in determining a benefit dimension and calculating a user fee. We cannot say that the Board's user fee of .02 cents per 100 gallons discharged was arbitrary or capricious. *See State ex rel. Great Northern Ry. Co. v. Dist. Court of Sixteenth Judicial Dist.,* 227 Minn. 482, 486–87, 36 N.W.2d 336, 339 (1949) (rejecting claims of arbitrariness and capriciousness, and upholding a method of determining benefits where the record indicated a thorough assessment).

■ Nor can we say that the assessment was beyond the Board's authority. As we note previously in this opinion, the statute provides the Board, as a drainage authority, some flexibility to make deter-minations regarding the use of its ditch and drainage systems. We note that this approach of limited flexibility is not uncommon to regulatory authorities. *See, e.g., In re Qwest's Wholesale Serv. Quality Standards,* 678 N.W.2d 58 (Minn.App. 2004). We also note that, as with the Board's authority to allow drainage of industrial wastewater, the Board's authority to assess fees is also not without limits. *See* Minn.Stat. § 103E.601 (2002); *In re Redetermination of Benefits of Nicollet County Ditch 86A,* 488 N.W.2d 482, 485–86 (Minn.App.1992) (finding the board's adoption of assessment violated statutory and constitutional guidelines because the assessed benefits were not proportional to actual benefits and failed to consider actual benefits). Here, we conclude that the complexities of the drainage system and its use provide the Board, as drainage authority, with implied authority to assess such fees.

## DECISION

Because the drainage statute allows the Freeborn County Board, as a drainage authority, jurisdiction to make decisions regarding the drainage of subsurface industrial wastewater and authority to assess reasonable volume-based user fees where the quantity of water drained is predictable, we affirm.

**Affirmed.**

---

2. We address only the benefits analysis as it pertains to Exol. We recognize that this large industrial discharge may affect the capacity of the ditch to handle large surface water runoff occasioned by natural causes and that the temperature of the Exol runoff may create yet other maintenance and environmental problems. We acknowledge that acceptance by the county of these problems constitutes a benefit to Exol.